**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| RANDSTAD PROFESSIONALS US, LLC,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH TAMBERRINO and VERITAS PARTNERS, LLC,<br><br>Defendants. | ) | CASE NO. |

**<u>COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES</u>**

Plaintiff Randstad Professionals US, LLC ("Randstad" or the "Company") files the following Complaint for injunctive relief and damages against defendants Joseph Tamberrino ("Tamberrino") and Veritas Partners, LLC ("Veritas"). Randstad brings a claim for violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, against Defendants. Randstad also brings a claim for tortious interference with contractual relations and business relations against Defendants for, *inter alia*, inducing non-parties Eric Howser and Bryan Watts ("Non-Parties" and, with Tamberrino and Veritas, "Defendants") to breach their agreements with Randstad. Randstad further brings claims for breach of the duty of loyalty and breach of fiduciary duty against Tamberrino. Randstad seeks injunctive relief against Defendants based upon these violations.

**INTRODUCTION**

1. This case is about Tamberrino's unlawful and covert efforts to spin off a Randstad team into a competing enterprise, Veritas. Specifically, while still employed and being compensated handsomely by Randstad as a National Director, Tamberrino surreptitiously set up a competing enterprise just down the road and lifted out the *entire team* of employees that he

managed, including his only two direct reports, Howser and Watts, and their office administrator, Susan Turk. Tamberrino informed Howser, Watts, and Turk about his plan in or about November 2017, and, upon information and belief, either asked or encouraged them to leave Randstad and join Veritas.

2. Tamberrino knew that Howser and Watts had employment agreements with Randstad containing restrictive covenants that prevented them from soliciting Randstad customers and employees, and otherwise unfairly competing with Randstad in the Baltimore market.

3. On or about January 3, 2018, without any advance notice, all four abruptly resigned from Randstad *en masse* to join Veritas, and have since been competing unfairly with Randstad in the Baltimore market. This type of behavior by Tamberrino—acting as a "corporate pied piper" and conspiring to bring about the mass resignation of key employees—is the *sine qua non* of a breach of a manager's duty of loyalty to his employer, and Veritas's entire existence is fruit of this poisonous tree.

4. Moreover, Howser and Watts both are both subject to Randstad's "Employee Non-Competition and Confidentiality Agreement" (the "Agreement"), which prohibit them from competing with Randstad for twelve (12) months within a reasonable geographic area; soliciting and selling to Randstad's customers and talent, or recruiting and hiring its employees, for eighteen (18) months; and using or disclosing Randstad's trade secrets and confidential information, among many other things. Tamberrino knew that Howser and Watts were subject to the Agreements when he hired and encouraged them to leave Randstad and compete with it on behalf of Veritas.

5. Veritas's headquarters (Tamberrino's home in Baltimore) is well within the reasonable restricted area set forth in the Agreements, where Veritas is admittedly selling staffing

services in direct competition with Randstad, and Howser's and Watts's participation therewith is a blatant violation of their respective Agreements.

6. Indeed, Howser and Watts agreed to the entry of a broad-reaching preliminary injunction by the federal court in Georgia, explicitly acknowledging that the Agreements are enforceable and implicitly admitting that their actions were in violation thereof and caused Randstad irreparable harm.

7. Defendants are now attempting to compete with Randstad in the Baltimore market by trading on its trade secrets and confidential information and its customer goodwill, threatening to cause irreparable harm to Randstad's protectable interests. The injunctive relief requested by Randstad is narrowly tailored to protect its legitimate business interests, is an appropriate remedy in light of Defendants' actions, and it is eminently reasonable under the circumstances.

## THE PARTIES AND OTHER RELEVANT PERSONS

8. Plaintiff Randstad is a Delaware limited liability company with a principal place of business in Atlanta, Georgia. None of Randstad's members are citizens of Maryland.

9. Defendant Tamberrino is a former Randstad National Director, whose residence is located at 16511 York Road, Monkton, Maryland.

10. Defendant Veritas is a limited liability company with its principal office located at 16511 York Road, Monkton, Maryland. Upon information and belief, Veritas' member or members are citizens of Maryland only.

11. Non-Party Howser is a former Randstad Executive Recruiter whose residence is, upon information and belief, located at 16511 York Road, Monkton, Maryland.

12. Non-Party Watts is a former Randstad Executive Recruiter, whose residence is, upon information and belief, located at 751 Shallow Ridge court, Abingdon, Maryland.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Randstad's claim against Defendants under the DTSA, 18 U.S.C. § 1836, *et seq.*, raises a federal question. Randstad's remaining claims likewise fall within this Court's supplemental jurisdiction (28 U.S.C. § 1367) because they are so related to the federal claim that they form part of the same case or controversy.

14. This Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00. Complete diversity exists because Defendants are citizens of Maryland, and Randstad is not a citizen of Maryland.

15. This Court has personal jurisdiction over Tamberrino because he is domiciled in Maryland.

16. This Court has personal jurisdiction over Veritas because it is organized in Maryland and because its principal place of business is located in Maryland.

17. Venue is proper in this Court because Defendants both reside in this district and division and because a substantial part of the events or omissions giving rise to Randstad's claims occurred in this district and division.

## FACTUAL BACKGROUND

### I. Randstad's Business, its Confidential Information and Trade Secrets, and its Customer Goodwill

18. Randstad is a leader in the staffing industry, providing total talent solutions to businesses throughout the United States. Among its services, Randstad identifies direct hire candidates and places temporary employees (collectively "Talent") with a diverse portfolio of businesses and organizations ("Customers") nationwide. Randstad specializes in the placement of

professional Talent, providing a comprehensive array of placement services within a variety of industries, including accounting and finance, office and administration, engineering, healthcare, legal, information technology, banking, sales and marketing, among others.

19. The staffing industry is a highly competitive, specialized business that is relationship-driven between customers, Talent, and the sales force. Through decades of hard work, dedication, innovation, and investment, Randstad has become an industry leader in the staffing industry.

20. Randstad invests heavily in developing and maintaining Customer relationships and in attracting and retaining top Talent for both its internal operations and for assignments with its Customers.

21. Randstad's success in the highly competitive staffing industry is directly dependent on its staffing teams' Customer and institutional knowledge and Randstad's ability to provide top quality Talent to its Customers, and top quality job placements to its Talent.

22. To meet its Customers' expectations and needs, Randstad has developed and maintained, at great expense, valuable and long-standing working relationships and substantial goodwill with its Customers.

23. Randstad has reasonably come to expect that its long-standing Customer relationships will continue into the future, and employs professionals, like the Defendants, to service those Customers and maintain and grow its relationships for the benefit of Randstad.

24. To maintain Randstad's long-standing Client relationships and to develop new relationships, Randstad expends substantial time, effort, and expense developing confidential business information and trade secrets.

25. Randstad's trade secrets and confidential information are not generally known in the industry or outside of Randstad, and could be learned by others, if at all, only through the expenditure of considerable time, effort, and expense.

26. Any information the Defendants have about Randstad's Customers – including pricing, Customer preferences, hiring needs, and the like – was obtained exclusively through Tamberrino's, Howser's, and Watts's employment with Randstad.

27. Randstad's trade secrets and confidential information are extremely valuable to Randstad because Randstad derives economic value from the information not being made public, and any Randstad competitor who acquired such information, including by hiring its employees in contravention of their Agreements, would be given an unfair competitive advantage.

28. Randstad's policies and procedures require that its trade secrets and confidential information be kept strictly confidential by its staff employees, and Randstad restricts access to such information.

29. Among other precautions taken by Randstad to protect its confidential data and Customer relationships, Randstad's employee handbook details its employees' confidentiality and data protection obligations. Randstad also requires its employees to enter confidential, personal usernames and passwords in order to gain access to Randstad's server and e-mail accounts. It employs a data loss prevention tool on all Randstad-issued computers. Randstad further requires staff employees to enter a unique username and password in order to gain access to the confidential, secure customer relationship management ("CRM") database. Other confidential databases, including a tool to assist with negotiating customer contracts, are also password protected.

30. Additionally, Randstad protects its confidential information by limiting access to physical space at its various offices. For example, employees must use company-issued badges to enter their office space.

31. Randstad's employees, including Tamberrino, Howser, and Watts, receive substantial training, information, business contacts, and other advantages that provide Randstad with a competitive advantage in the marketplace.

32. Tamberrino, Howser, and Watts, through their employment with Randstad, gained unique knowledge of and had access to Randstad's trade secrets and other confidential and proprietary information, including, without limitation, information relating to Randstad's business strategies, finances, methodologies, processes, pricing, Customers and employees ("Confidential Information").

## II. Tamberrino's, Howser's, and Watts's Employment with Randstad, Employment Agreements, and Access to Confidential Information

33. Tamberrino joined Randstad in or around September 2011, when Randstad acquired the parent of Tamberrino's former employer, the Mergis Group. The acquisition was a stock deal, meaning that Randstad stepped into the Mergis Group's shoes as a matter of law, including with respect to its employment agreements, Customer and Talent relationships and goodwill, and all confidential information and trade secrets among many other things.

34. Upon information and belief, when Tamberrino joined the Mergis Group several years before Randstad acquired its parent company in 2011, he would have executed an employment agreement similar to Howser's and Watts's Agreement (addressed in detail below), as it was the Mergis Group's regular practice to seek non-compete agreements from its employees.[1]

[1] For this reason, Randstad is not, at this point, asserting a breach of contract claim against Tamberrino. Randstad reserves the right, however, to amend this Complaint should his agreement with the Mergis Group surface during the litigation.

35. After the acquisition, efforts were made to have former Mergis employees sign updated agreements with Randstad. Randstad's belief that Tamberrino had a non-compete agreement in place is supported by communications sent from Tamberrino to Randstad HR and management personnel, indicating he believed he was subject to a non-compete and asking for a copy of the same.

36. Randstad also requires many of its employees to execute employment agreements containing restrictive covenants to protect its confidential information and Customer relationships and prevent the solicitation of its employees by departing employees.

37. On or about July 11, 2017, Tamberrino e-mailed Randstad's HR department seeking a copy of his non-compete agreement. When Randstad discovered that an electronic copy of Tamberrino's non-compete agreement could not be located, it advised Tamberrino that it was searching for a paper copy to share with him. Tamberrino assured Randstad that his request for a copy of his non-compete "shouldn't set off any alarms." Contemporaneous e-mail communications indicated that Tamberrino chose to lay low and not push the issue of his non-compete, hoping it could not be located.

38. When a copy of Tamberrino's non-compete agreement could not be located, Randstad presented him with a restrictive covenant agreement within weeks (in early August 2017) and asked him to sign it, but Tamberrino refused to sign Randstad's standard agreement and tried to negotiate the terms. Given the longevity of his employment, Randstad attempted to negotiate the agreement in good faith.

39. In the meantime, unbeknownst to Randstad, Tamberrino began taking steps to compete against Randstad, forming his own staffing company by October 2017 (while still employed by Randstad), working on the new company's branding/website during his employment,

and setting in motion a plan to compete against Randstad using Randstad's employees and Confidential Information.

40. Watts was hired originally hired by Mergis Group, which was later acquired by Randstad on or around April 27, 2011, and worked as an executive recruiter. He signed his Agreement with Randstad on or about February 1, 2016.

41. Howser was hired by Randstad and signed his Agreement with Randstad on or around July 11, 2016. Howser worked as an executive recruiter.

42. While employed by Randstad, Tamberrino, Howser, and Watts worked out of Randstad's office located at 120 E Baltimore Street, Suite 2220, Baltimore, Maryland.

43. As a condition of their employment with Randstad, Howser and Watts received and signed the Agreement.

44. The Agreement defines "Confidential Information" as:

> [D]ata and information belonging to the Company (i) relating to the Business of the Company, (ii) which has been disclosed to [Howser/Watts] or of which [Howser/Watts] became aware as a consequence of or through [Howser's/Watts's] relationship with the Company, (iii) which has value to the Company, and (iv) which is not generally known to the public or the Company's competitors. Without limiting the generality of the foregoing, "Confidential Information" includes the Company's proprietary processes and methods of operation, pricing, margin and mark-up information, strategic plans, training techniques and manuals, recruitment and placement strategies and targets, financial data and projections, sales and marketing information, personnel information, information concerning Placement Candidates and Talent (such as employment preferences, salary requirements/history, contact information, availability, customer feedback and interpersonal skills), and information concerning actual or prospective customers (such as hiring preferences, staffing needs, hiring manager contact information, pricing and job orders). Notwithstanding anything herein to the contrary, the term "Confidential Information" shall not be interpreted to include or mean any data or information that has been voluntarily disclosed to the public by the Company (except where such public disclosure has been made by [Howser/Watts] without authorization from the Company), or that has been independently developed and disclosed by others, or that enters the public domain through lawful means.

45. The Agreement states that "the Company desires to employ or continue employing [Howser/Watts] with valuable training and access to the Company's Confidential Information and Trade Secrets; and [Howser/Watts] desires such employment, training and access."

46. The Agreement further states that "[i]n consideration of his or her mutual promises contained herein and for good and valuable consideration, the receipt of which is hereby acknowledged, [Howser/Watts] and the Company agree" to be bound by a number of obligations to Randstad.

47. Howser and Watts further "acknowledge[d] that the Company has expended substantial amounts of money, time and effort in developing and maintaining its extensive personnel resources, Confidential Information, Trade Secrets, goodwill and relationships with customers, Placement Candidates, Talent and associate (internal) employees." As a result, Howser and Watts agreed to "devote his or her best efforts, attention and energies to the Company's business at all times during his or her employment. Furthermore, in consideration of the Company's initial and continuing employment of [Howser/Watts], the Company's provision to [Howser/Watts] of initial and ongoing training regarding the Company's business, and the Company's entrustment to [Howser/Watts] of the Company's Confidential Information and Trade Secrets (without such training and entrustment of Confidential Information and Trade Secrets [Howser/Watts] acknowledges that [they] could not perform his or her job duties and responsibilities), [Howser/Watts] agree[d] as follows:"

48. Section 3 of the Agreement, entitled "Entrustment and Preservation of Confidential Information and Trade Secrets," provides in part:

> (a) [Howser/Watts] acknowledges that Confidential Information and Trade Secrets are valuable, special and unique assets of the Company's business. In the course of [Howser's/Watts's] employment with the Company, the Company will disclose to Employee and grant Employee access to

Confidential Information and Trade Secrets, and Employee desires to be, and will be, entrusted with such Confidential Information and Trade Secrets during employment by the Company. In consideration of the Company's entrusting to [Howser/Watts] certain of its Confidential Information and Trade Secrets, [Howser/Watts] shall not directly or indirectly reproduce, use, distribute, disclose, publish, or misappropriate any Confidential Information or Trade Secrets on behalf of [Howser/Watts] or any person or entity other than the Company for any purpose whatsoever (i) at any time during [Howser's/Watts's] employment with the Company, and (ii) after [Howser's/Watts's] separation from employment with the Company (for any reason) for so long as the information in question meets the definition of Confidential Information set forth in Section 2(b), up to a maximum of two (2) years from the date of such separation of employment; provided that as to any Confidential Information that constitutes a Trade Secret under applicable law, these restrictions shall apply for so long as the information remains a Trade Secret. [Howser/Watts] acknowledges that any such prohibited use or disclosure of Confidential Information or Trade Secrets is likely to cause irreparable harm and financial loss to the Company.

(b) Unless done for and on behalf of the Company during [Howser's/Watts's] employment by the Company, Employee will never use or disclose any person's Personal Information which [Howser/Watts] may learn or acquire at any time during employment with the Company. Furthermore, [Howser/Watts] shall at all times take appropriate measures to protect against the loss of, or damage to, Personal Information in the [Howser's/Watts's] possession or control.

49. In Section 4 of the Agreement, entitled "Restrictive Covenants," Howser and Watts agreed:

(a) During [Howser's/Watts's] employment with the Company and the eighteen (18) month period immediately following the date of [Howser's/Watts's] separation of employment with the Company, regardless of the reason for such separation, [Howser/Watts] shall not, directly or indirectly, on [Howser's/Watts's] own behalf or on behalf of any person or entity other than the Company:

(i) contact, solicit, service, sell to, or attempt to contact, solicit, service, or sell to any customer of the Company with whom [Howser/Watts] had Material Contact at any time during the twelve (12) months prior to the date of [Howser's/Watts's] separation of employment with the Company for the purpose of providing services competitive with the Business of the Company;[2]

[2] "Business of the Company" is defined as "the services provided by the Company, including but not limited to temporary, temporary to hire, direct hire and outsourced placement and staffing

> (ii) contact, solicit, service, place, or attempt to contact, solicit, service, or place any Placement Candidate or Talent with whom the [Howser/Watts] had Material Contact at any time during the twelve (12) months prior to the date of [Howser's/Watts's] separation of employment with the Company for the purpose of providing services competitive with the Business of the Company;
>
> (iii) contact, recruit, or solicit, or attempt to contact, recruit, or solicit any associate (internal) employee of the Company with whom the [Howser/Watts] worked at any time during the twelve (12) months prior to the date of [Howser's/Watts's] separation of employment with the Company for the purpose of encouraging, enticing or causing such associate (internal) employee to terminate employment with the Company, or to accept employment with any person or entity that competes with the Business of the Company; or
>
> (iv) hire any associate (internal) employee of the Company with whom the [Howser/Watts] worked at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company for any person or entity that competes with the Business of the Company.

50. Howser and Watts further agreed that in Section 4(b) that "[d]uring his or her period of employment with the Company, [Howser/Watts] shall not, directly or indirectly, engage in (or own more than a five (5) percent interest in any entity which engages in) activities or services competitive with the Business of the Company."

51. In section 4(c), Howser and Watts agreed:

> During [Howser's/Watts's] employment with the Company and the twelve (12) month period immediately following the date of [Howser's/Watts's] separation of employment with the Company, regardless of the reason for such separation, [Howser/Watts] shall not, within the Restricted Territory, directly or indirectly, operate, control, or own any entity which engages in activities competitive with the Business of the Company (other than owning, as a passive investment, no more than a five (5) percent interest in any such entity).

services, payrolling, recruitment process outsourcing, independent contractor assessment and placement, HR and management consulting, managed services, or other services that are the same as or substantially similar to the services Employee provided on behalf of the Company within two (2) years prior to the date of [Howser's and Watts's] separation from the Company."

52. The Agreement defines the "Restricted Territory" as the following geographic territory:

> (i) a radius of twenty-five (25) miles of any office(s) to which Employee was assigned or which Employee managed, during the twelve (12) months prior to the date of Employee's separation of employment with the Company;
>
> (ii) a radius of twenty-five (25) miles of any office(s) in which Employee performed services on behalf of the Company at any time during the twelve (12) months prior to the date of Employee's separation of employment with the Company;
>
> (iii) a radius of twenty-five (25) miles of any office(s) in which the Company employed personnel whom Employee directly or indirectly supervised or managed during the twelve (12) months prior to the date of Employee's separation of employment with the Company; and
>
> (iv) any region or territory to which Employee was actually assigned or which Employee managed during the twelve (12) months prior to the date of Employee's separation of employment with the Company.

53. In section 4(d), Howser and Watts agreed:

> During [Howser's/Watts's] employment with the Company and the twelve (12) month period immediately following the date of [Howser's/Watts's] separation of employment with the Company, regardless of the reason for such separation, Employee shall not, within the Restricted Territory, directly or indirectly, on [Howser's/Watts's] own behalf or on behalf of any person or entity other than the Company, hold any position as an employee, agent, contractor, or otherwise, for or with any person or entity which engages in activities competitive with the Business of the Company if such position involves:
>
> (i) providing products or services competitive with the Business of the Company;
>
> (ii) supervising employees or other personnel who provide products or services competitive with the Business of the Company;
>
> (iii) developing or implementing strategies or methodologies related to products or services competitive with the Business of the Company; or
>
> (iv) engaging in responsibilities in which [Howser/Watts] would utilize or disclose Confidential Information.

54. Section 6 of the Agreement, entitled "Return of Company Documents and Equipment," provides that:

> [Howser/Watts] acknowledges that all originals, copies and summaries of manuals, memoranda, notes, notebooks, records, reports, plans, computer-based data in any form, tabulations or compilations, and other documents or items of any kind concerning any matters affecting or relating to the present or potential business of the Company, whether or not they contain Confidential Information or Trade Secrets, and all Company-owned equipment which may be provided for [Howser's/Watts's] use while employed by the Company, are and shall continue to be the property of the Company. [Howser/Watts] shall return to the Company all such documents and equipment in the possession or under the control of the [Howser/Watts] immediately upon the date of [Howser's/Watts's] separation of employment with the Company or sooner if requested by the Company.

55. Section 7 of the Agreement, entitled "Freedom to Contract," states that:

> [Howser/Watts] represents to the Company that he or she has the legal right to enter into this Agreement without violating any other employment agreement or consulting arrangement, including any non-competition, non-solicitation or confidentiality agreements (collectively, "Other Contracts"), and that he or she will not become subject to any Other Contracts in conflict with this Agreement during the [Howser's/Watts'] employment with the Company. [Howser/Watts] further represents that he or she will not upload to the Company's systems, disclose to the Company, or use for the Company'' benefit any trade secrets or confidential information which is the property of any prior employer or other third party. If [Howser/Watts] fails to disclose or breaches any Other Contracts, the Company may incur significant legal exposure and expenses. Accordingly, in the event of any such failure to disclose or breach of Other Contracts, the Company reserves the right to terminate [Howser's/Watts's] employment and to seek all available legal remedies in connection with the breach of the representations set forth in this Section.

56. Section 8 of the Agreement, entitled "Enforcement and Damages," provides:

> [Howser/Watts] acknowledges that the Company will suffer irreparable injury and damage and cannot be reasonably or adequately compensated in monetary damages alone for the loss by the Company of its benefits or rights under this Agreement as the result of a breach, default or violation by [Howser/Watts] of any of his or her obligations under this Agreement. Accordingly, the Company shall be entitled, in addition to all other remedies which may be available to it (including monetary damages), to injunctive and other available equitable relief in any court of competent jurisdiction in

> Cobb County, Georgia to prevent or otherwise restrain or terminate any actual or threatened breach, default or violation by [Howser/Watts] of any provision of this Agreement or to enforce any such provision. The Company will not be required to post any bond as a condition of the Company receiving such injunctive relief, and [Howser/Watts] hereby specifically waives the right to request or require the posting of a bond as a condition of the Company receiving injunctive relief. [Howser/Watts] shall reimburse the Company for all reasonable legal fees and costs incurred by the Company in connection with bringing a successful action to enforce this Agreement.

57. Section 16 of the Agreement, entitled "Governing Law and Selection of Forum," states:

> This Agreement and the rights and obligations of the parties hereunder shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Agreement shall be governed by, the laws of the state of Georgia, without giving effect to provisions thereof regarding conflict of laws. Any claims arising out of or related to the covenants in Sections 3, 4, 5, and 6 of this Agreement, all claims arising under applicable law governing trade secrets, and all claims for emergency injunctive relief, must be litigated exclusively in the Superior or State Courts of Cobb County, Georgia, provided, however, that any such claim or cause of action may be brought in, or removed to, the United States District Court for the Northern District of Georgia, Atlanta Division, to the extent that such court would have jurisdiction over the subject matter of such action. [Howser/Watts] and the Company waive any objection based on personal jurisdiction and forum non conveniens and waive any objection to venue of any action instituted hereunder to the extent that an action is brought in the courts identified above. Each party agrees that a final judgment in any such action shall be conclusive and may be enforced in any other jurisdiction in any manner provided by law.

58. Finally, Howser and Watts "represent[ed] that [they] read this Agreement completely and carefully and that he or she understands the contents and effect of this Agreement. [Howser and Watts] further represent[ed] that [they] had the opportunity to consult with an attorney before voluntarily signing below and has either consulted with an attorney or waived the opportunity to do so."

59. Howser or Watts never told Randstad that they did not understand anything in the Agreement or that they did not intend to comply therewith. Randstad reasonably believed that Howser and Watts did, in fact, understand and intend to comply with the Agreement in its entirety, and reasonably relied thereon in continuing to employ them and to provide them with access to its confidential information and trade secrets, and access to its Customers and Talent.

60. Similarly, Randstad believed that Tamberrino was subject to a similar agreement with the Mergis Group, and was negotiating a new agreement with Randstad in good faith once it was discovered that the legacy agreement could not be located. Tamberrino was not negotiating in good faith, but Randstad reasonably relied thereon in continuing to employ him and to provide him with access to its confidential information and trade secrets, and access to its Customers and Talent.

61. As noted *supra*, Howser, Watts, and Tamberrino were also bound by the provisions of the Employee Handbook, including the provisions contained therein regarding protection of confidential information. Indeed, Howser and Watts acknowledged such in the Agreement: "The Employee shall comply with all applicable Company policies of which he or she has been made aware, including but not limited to those policies found in the Employee Handbook published on the Human Resources Department's page of Randstad Connect (https://www.randstadconnect.com/ sitesiHR)." They were all aware that it was accessible on the Randstad intranet website, and that on request, they could receive a hard copy from Human Resources.

62. As a National Director, Tamberrino was responsible for driving the business of the Baltimore office, individual production focused on making direct hire placements, supervising Howser and Watts, and overseeing the banking/financial services and legal practice groups within Randstad nationwide.

63. As executive recruiters, Howser and Watts were responsible for servicing Randstad's Customers by identifying qualified Talent for placement. They reported directly to Tamberrino and took direction from him in the day-to-day performance of their duties.

64. Howser and Watts were Tamberrino's only direct reports at all relevant times.

65. Turk was the office administrator for Randstad's Baltimore office, and supported Tamberrino, Howser, and Watts.

66. While employed by Randstad, Tamberrino, Howser, and Watts were given access to Randstad's trade secrets and confidential information.

67. The confidential information to which Tamberrino, Howser, and Watts had access during their employment with Randstad constitutes trade secrets that are critical to Randstad's competitive position in the staffing industry.

68. If Randstad's trade secret information were to fall into the hands of a competitor, such as Veritas, even inadvertently, Randstad's competitive position would be severely harmed, and the competitor would be able to trade on many years' worth of valuable accumulated knowledge.

69. Likewise, if a former employee, such as Tamberrino, Howser, or Watts, retained Randstad's trade secrets after his employment ended, and accessed or used them while working for a competitor, even if inadvertently, Randstad's competitive position would be seriously harmed.

## III. Tamberrino Forms Veritas and Recruits Howser, Watts, and Turk While Still Employed by Randstad as a Management Level Employee

70. Tamberrino registered Veritas with the Maryland Secretary of State on or about October 21, 2017. Upon information and belief, he was making plans to set up Veritas and to recruit his entire team long before that date.

71. Tamberrino told Howser, Watts, and Turk of his plan and, upon information and belief, either asked or encouraged them to leave Randstad and join Veritas, by November 30, 2017, at the latest (and perhaps before)

72. At the very least, even if he did not formally ask them to join him at Veritas, Tamberrino he directly or indirectly solicited them by telling Howser, Watts, and Turk of his plan well in advance of his resignation.

73. Upon information and belief, the Tamberrino, Howser, Watts, and Turk conspired to resign as a group and to work for Veritas in direct competition with Randstad.

74. By virtue of his role as a National Director, and Howser's and Watts's direct supervisor, Tamberrino was aware not only of the Agreements, but also of the confidential compensation and benefits arrangements Howser and Watts received from Randstad, and the details and amounts thereof, and was thus able to make competitive offers to them for employment at Veritas based upon this confidential information.

75. Indeed, on or about November 30, 2017, Defendants began gathering information regarding their Randstad benefits, presumably to determine whether a move to Veritas would be viable.

76. By December 8, 2017, Veritas had registered a website for purposes of advertising and marketing its services.

77. And on December 21, 2017, Tamberrino, Howser, Watts, and Turk all attended a team lunch, at which, upon information and belief, they discussed and/or planned the conspiracy. Unbelievably, the cost of this planning lunch was submitted to Randstad for reimbursement.

## IV. Tamberrino, Howser, Watts, and Turk Abruptly Resign from Randstad *En Masse* and Join Veritas

78. On January 3, 2018, Tamberrino, Howser, Watts, and Turk all abruptly resigned from Randstad, in what was plainly a coordinated effort.

79. All four sent e-mails to the entire Baltimore office announcing their departures on that date.

80. In the days and weeks leading up to their abrupt departures, Tamberrino, Howser, and Watts downloaded and/or printed voluminous amounts of materials from Randstad's databases.

81. Tamberrino had two exit interviews following his departure, during which he stated that he was unhappy with how Randstad had integrated the Mergis Group following Randstad's acquisition of it in 2012. That was the only reason he provided for his decision to leave Randstad.

82. Upon information and belief, Tamberrino, Howser, and Watts are all working for Veritas out of its Monkton, Maryland office, and are servicing clients in the same territories they served while employed by Randstad.

83. Veritas's website made it clear that the Defendants are competing directly with Randstad in the same space, posting numerous positions in the banking/financial services and legal markets in the Baltimore area, which is within the prohibited territory detailed in the Howser and Watts Agreements and in the same territory where Tamberrino worked.

## V. Randstad Obtains a Consent Preliminary Injunction Against Howser and Watts.

84. On March 2, 2018, Randstad filed a Complaint in the United States District Court for the Northern District of Georgia, Atlanta Division, against Tamberrino, Howser, and Watts, captioned *Randstad Professionals US, LLC v. Tamberrino, et al.*, C.A. No. 1:18-cv-00940-ELR

(the "GA Action"), and asserted claims for violations of the Defend Trade Secrets Act of 2016, breaches of Howser's and Watts' employment agreements, and various common-law torts.

85. Howser, Watts, and Tamberrino were all represented by the same counsel in the GA Action, who likewise represents Tamberrino and Veritas in this action.

86. On March 27, 2018, the parties agreed to entry of a Consent Preliminary Injunction against Howser and Watts [ECF No. 22]. The Georgia district court signed the Consent Preliminary Injunction on March 28, 2018 [ECF No. 23].

87. In the Consent Preliminary Injunction, the parties agreed to the following facts relevant to Randstad's remaining claims:

- Randstad has legitimate, protectable business interests in its relationships with its customers, Talent, and employees and in its Confidential Information and trade secrets. (Consent Order ¶¶ 7, 10.)

- Randstad provided Tamberrino, Watts, and Howser with access to Confidential Information and trade secrets during the course of their employment with Randstad. (*Id.* ¶ 8.)

- Randstad takes reasonable measures and precaution to protect its Confidential Information and trade secrets, and Randstad had expended substantial amounts of money, time, and effort in developing and maintaining such information. (*Id.* ¶ 9.)

- Section 3 of Howsers' and Watts' agreements is a valid and enforceable contractual expression of Randstad's legitimate business interests in protecting its Confidential Information. (*Id.* ¶ 14.)

- Section 4 of Howsers' and Watts' agreements is a valid and enforceable contractual expression of Randstad's legitimate business interests in protecting its relationships with customers, Talent, employees, and customer goodwill in the Baltimore, Maryland market. (*Id.* ¶ 16.)

- The restrictive covenants contained in Howsers' and Watts' restrictive covenant agreements are reasonable in time, geographic area, and in the scope of the prohibited activities. Howser and Watts acknowledged that, in connection with their employment with Randstad, they customarily and regularly solicited, on Randstad's behalf, customers and prospective customers. (*Id.* ¶ 18.)

- Veritas is a competitor to Randstad and maintains its principal office within the Restricted Area, as that term is defined in Howser's and Watts' agreements. (*Id.* ¶ 20.)

88. On April 17, 2018, in exchange for an agreement by Howser, Watts, and Tamberrino's counsel that he would accept service of the summons and complaint and that they would stipulate to expedited discovery in this action (as set forth in the Joint Stipulation Regarding Expedited Discovery, filed contemporaneously herewith), and so as to avoid a costly fight over whether the Georgia court had personal jurisdiction over Tamberrino (which Randstad believes it does), Randstad voluntarily dismissed the GA Action, without prejudice.

**COUNT I: VIOLATIONS OF THE DEFEND TRADE SECRETS ACT OF 2016**
**(Against All Defendants - For Damages)**

89. Randstad repeats and realleges each and every allegation contained in Paragraphs 1 through 88 of the Complaint as if fully set forth herein.

90. The DTSA, which amended the Economic Espionage Act, 18 U.S.C. § 1832, to add a federal civil cause of action, among other things, defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

91. During the course of his employment with Randstad, Tamberrino was provided access to substantial amounts of Randstad trade secrets, as described herein.

92. Such trade secrets are developed and maintained by Randstad at great time, cost and expense to Randstad, and is maintained on password protected networks accessible only by certain Randstad employees with need to use such information on the Company's behalf.

93. Randstad's trade secrets are not available to the general public and are closely guarded by Randstad. Randstad keeps such information strictly confidential in order to maintain a competitive advantage.

94. Randstad derives independent economic value from the trade secrets and confidential information entrusted to Tamberrino, Howser, and Watts; these secrets are not generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use, and the information is the subject of significant efforts to maintain its secrecy.

95. Randstad's trade secrets, including the information identified herein, are trade secrets under the DTSA, 18 U.S.C. § 1832 *et seq.*, because Randstad derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

96. Upon information and belief, Tamberrino acquired Randstad's trade secrets by improper means and without authorization. For example, Defendants printed voluminous documents, many of which, upon information and belief, contained highly confidential Randstad information and materials, in the last 60 days of his employment with Randstad, in violation of Randstad's policies regarding protection of confidential information, including but not limited to the policies contained in the Employee Handbook.

97. Upon information and belief, Tamberrino, Howser, and Watts have also used or disclosed Randstad's trade secrets to or on behalf of Veritas, or will do so inevitably, in violation of the DTSA.

98. Upon information and belief, Tamberrino, Howser, and Watts, acting within the scope of their employment with Veritas, have used or disclosed, or intend to use or disclose, Randstad's confidential customer information for Veritas's benefit, without express or implied consent.

99. Tamberrino and Veritas knew or should have known that the information, as described, (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by Randstad at great expense and effort; (4) was maintained as confidential and is not generally available to the public and Randstad's competitors; (5) would provide significant benefit to a company seeking to compete with Randstad; and (6) is critical to Randstad's ability to conduct its business successfully.

100. Tamberrino and Veritas actually misappropriated and/or threaten to inevitably misappropriate Randstad's trade secrets and confidential information without Randstad's consent.

101. The information that Defendants have misappropriated or threaten to misappropriate describes and relates to Randstad, which involve services that are utilized throughout interstate commerce.

102. Defendants will be or are unjustly enriched by the misappropriation and/or threatened misappropriation of Randstad's trade secrets and confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Randstad's trade secrets and confidential information.

103. Defendants' actual and/or threatened misappropriation has been willful and malicious.

104. As a result of the threatened and/or actual misappropriation of Randstad's trade secrets and confidential information, Randstad will be threatened with loss of business

expectancies, customers, employees, its trade secrets and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of the Court.

105. In addition, Randstad seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

106. Because the Defendants' misconduct is ongoing and poses a threat of significant irreparable harm that cannot be compensated by money alone, Randstad requests that this Court grant injunctive relief against the Defendants from actual or threatened disclosure or utilization of Randstad's trade secrets, in addition to granting Randstad its attorneys' fees and exemplary damages.

**COUNT II: BREACH OF FIDUCIARY DUTY**
**(Against Tamberrino - For Damages and Injunctive Relief)**

107. Randstad repeats and realleges each and every allegation contained in Paragraphs 1 through 106 of the Complaint as if fully set forth herein.

108. In his role as National Director at Randstad, Tamberrino was placed in a position of trust and confidence, and was expected to devote his full time to the management and promotion of Randstad's business interests.

109. As a result of this special relationship and privilege, Tamberrino owed certain fiduciary duties to Randstad including, but not limited to, a duty of loyalty and honesty, and a duty not to act in a way contrary to the interests of Randstad.

110. Based on this fiduciary relationship, Tamberrino owed, among other things, a duty to not misappropriate business and business opportunities, a duty to act in the best interests, and a duty generally not to do anything on behalf of a competing business, while employed by Randstad.

111. During the course of his employment with Randstad, Tamberrino breached his fiduciary duty by, among other things, orchestrating the mass departure of his entire team of employees; misappropriating Randstad's confidential, proprietary and trade secret information for his own benefit; failing to return the confidential, proprietary and trade secret information; using or disclosing that information for the benefit of himself contrary to Randstad's best interests, including disclosing the information to Veritas, while Tamberrino was still an employee of Randstad; and developing a plan to divert corporate opportunities from Randstad to a competitor.

112. As a direct result of Tamberrino's breach of his fiduciary duties, Randstad is suffering and will continue to suffer irreparable injury, including loss of business expectancies, its confidential and trade secret information, and damage to goodwill, for which a remedy at law is inadequate. Accordingly, Randstad is entitled to injunctive and equitable relief.

**COUNT III: BREACH OF THE DUTY OF LOYALTY**
**(Against Tamberrino - For Damages and Injunctive Relief)**

113. Randstad repeats and realleges each and every allegation contained in Paragraphs 1 through 112 of the Complaint as if fully set forth herein.

114. In his role as National Director at Randstad, Tamberrino was placed in a position of trust and confidence, and was expected to devote his full time to the management and promotion of Randstad's business interests.

115. As a result of this special relationship and privilege, Tamberrino owed certain non-fiduciary duties to Randstad including, but not limited to, a duty of loyalty and honesty.

116. Based on the employer-employee relationship, Tamberrino owed, among other things, a duty to not misappropriate business and business opportunities, a duty to act in the best interests, and a duty generally not to do anything on behalf of a competing business, while employed by Randstad.

117. During the course of his employment with Randstad, Tamberrino breached his common-law duties to Randstad by, among other things, orchestrating the mass departure of his entire team of employees; misappropriating Randstad's confidential, proprietary and trade secret information for his own benefit; failing to return the confidential, proprietary and trade secret information; using or disclosing that information for the benefit of himself contrary to Randstad's best interests, including disclosing the information to Veritas, while Tamberrino was still an employee of Randstad; and developing a plan to divert corporate opportunities from Randstad to a competitor.

118. As a direct result of Tamberrino's breach of his common-law duties, Randstad is suffering and will continue to suffer irreparable injury, including loss of business expectancies, its confidential and trade secret information, and damage to goodwill, for which a remedy at law is inadequate. Accordingly, Randstad is entitled to injunctive and equitable relief.

## COUNT IV: TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
**(Against All Defendants - For Damages and Injunctive Relief)**

119. Randstad repeats and realleges each and every allegation contained in Paragraphs 1 through 118 above and incorporates them as if fully set forth herein.

120. Randstad has valid contracts with Howser and Watts.

121. Defendants had knowledge of the non-compete, non-solicitation, and confidentiality provisions of the Agreement.

122. Defendants induced Howser and Watts to breach their agreements by soliciting Howser and Watts to accept employment with Veritas in violation of the non-compete provision of the Agreement; by colluding with Howser and Watts to solicit Turk in violation of the non-solicit provision of the Agreement; and by colluding with Howser and Watts to misappropriate

Randstad's confidential information and trade secrets in violation of the confidentiality provision of the Agreement.

123. Defendants' interference was improper in means and motive.

124. As a result of Defendants' intentional interference with Randstad's contractual relations with Howser and Watts, Randstad has suffered substantial and irreparable injury and is threatened with further substantial injury due to Defendants' continued interference with Randstad's contractual relationships with its employees.

125. By reason of the foregoing, Randstad requires injunctive relief. Unless injunctive relief is granted, Randstad will be irreparably harmed in a manner not fully compensable by money damages. In addition, Randstad has been damaged in an amount to be determined at trial.

**COUNT V: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**
**(Against All Defendants - For Damages and Injunctive Relief)**

126. Randstad repeats and realleges each and every allegation contained in Paragraphs 1 through 125 above, and incorporates them as if fully set forth herein.

127. Defendants' activities as set forth above constitute tortious interference with the business relations of Randstad.

128. Specifically, Defendants induced Howser and Watts to breach their Agreements with Randstad improperly and without privilege, namely, the non-compete, non-solicit, and confidentiality provisions contained therein, and by hiring Howser and Watts with the intent of so doing, and thereby tortiously interfered with Randstad's business relationship.

129. Additionally, upon information and belief, Defendants have interfered improperly and without privilege with Randstad's business relations with its customers by misappropriating its confidential information and trade secrets concerning those customers in an effort to induce them to discontinue their relationship with Randstad and enter into a relationship with Veritas.

130. Defendants took the aforementioned actions to gain an unfair competitive advantage over Randstad, to wit, to create a new staffing firm and get it off the ground far sooner, and for far less money, than it would have been able to do had it grown the business organically.

131. As a result of Defendants' interference with Randstad's business relations, Randstad has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

132. By reason of the foregoing, Randstad requires injunctive relief. Unless injunctive relief is granted, Randstad will be irreparably harmed in a manner not fully compensable by money damages. In addition, Randstad has been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

Wherefore, Randstad respectfully requests that this Court:

1) Grant Randstad an injunction enjoining Tamberrino and Veritas from facilitating violations of the Consent Preliminary Injunction and Howser's and Watts' employment agreements;

2) Grant Randstad an injunction enjoining Tamberrino and Veritas from accessing, using, disclosing, revealing, copying, or misappropriating or threatening to misappropriate any Randstad trade secrets or confidential information;

3) Grant Randstad an injunction ordering Tamberrino and Veritas to immediately return all Randstad property that they have in their possession, and to verify in writing that they have returned all such information and have retained no copy, or if not, provide an accounting for any such information that cannot be returned;

4) Grant Randstad an injunction enjoining Tamberrino and Veritas, for eighteen (18) months, from directly or indirectly soliciting, doing business with, attempting to solicit or do business with, Randstad customers or prospective customers, from directly or indirectly soliciting or attempting to solicit any Randstad Talent or Randstad employees with whom Tamberrino, Howser, and/or Watts had, respectively, business contact or material contact during the last twelve (12) months of their employment with Randstad;

5) Enter judgment in favor of Randstad and against the Defendants for actual damages caused by Defendants' actions in an amount to be proven at trial;

6) Award Randstad pre-judgment and post-judgment interest, as well as punitive damages in an amount to be determined at trial;

7) Award Randstad the costs of this proceeding, and reasonable attorneys' fees pursuant to statute and contract; and

8) Award Randstad all other and further relief as this Court may deem just and proper.

Respectfully submitted,

ON BEHALF OF RANDSTAD PROFESSIONALS US, LLC

By *_/s Renee B. Appel_*
Renee B. Appel
SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, D.C. 20004
Telephone: (202) 463-2400
rappel@seyfarth.com

*Of counsel:*

Erik W. Weibust (to be admitted *pro hac vice*)
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
Telephone: 617-946-4800
Facsimile: 617-946-4801
eweibust@seyfarth.com

Alex Meier (to be admitted *pro hac vice*)
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E., Suite 2500
Atlanta, Georgia 30309
Telephone: (404) 885-6772
ameier@seyfarth.com

*Attorneys for Plaintiff*

Date: April 17, 2018